IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| SAS ASSOCIATES 1, LLC, ) </br> ) </br> and ) </br> ) </br> MILITARY 1121, LLC, ) </br> ) </br>         Plaintiffs, ) </br> v. ) </br> ) </br> CITY COUNCIL FOR THE CITY OF ) </br> CHESAPEAKE, ) </br> ) </br> **Serve:**    Jacob P. Stroman, Esquire ) </br>         City Attorney ) </br>         City of Chesapeake, VA ) </br>         306 Cedar Road ) </br>         Chesapeake, Virginia 23322 ) </br> and ) </br> ) </br>         Dr. Richard W. West, Mayor ) </br>         City of Chesapeake, VA ) </br>         306 Cedar Road ) </br>         Chesapeake, Virginia 23322 ) </br> ) </br> ) </br>         Defendant. ) | Case No. 2:21-cv- |

## COMPLAINT

NOW COME Plaintiffs SAS Associates 1, LLC ("SAS") and Military 1121, LLC ("Military," and together with SAS, "Plaintiffs" or "Owners"), by counsel, pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and Va. Code § 15.2-2208, and bring this Complaint moving this Court for entry of a declaratory judgment and further relief that the decision by the City Council of Chesapeake ( "Council") was unconstitutional. In support of its Complaint, Plaintiffs state the following:

**PARTIES**

1. SAS is a Virginia limited liability company with its principal place of business located in Virginia Beach, Virginia.

2. Military is a Virginia limited liability company with its principal place of business located in Chesapeake, Virginia.

3. SAS is the applicant in a rezoning case filed in the City of Chesapeake, Virginia ("City"), related to the proposed development of several parcels of property located generally on the southeast corner of the intersection of Great Bridge Boulevard and Fernwood Farms Road, and identified as Tax Map Parcels 03600000001000 ("Parcel 1"), 030000000990 ("Parcel 2"), 0360000000980 ("Parcel 3"), and 0360000000981 ("Parcel 4"), in the City (the "Property").

4. SAS and Military are the owners of the Property.

5. The City is an independent city chartered by the General Assembly of Virginia.

6. The Council is the legislative branch of the government of the City.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

**GENERAL ALLEGATIONS**

A.   *Background*

9. The Property consists of 90.58 acres of land. Parcel 1 contains approximately 76.391 acres and has mixed zoning (including R-15S (Residential), B-4 (Business), and A-1 Agricultural)). Parcel 2 contains 0.344 acres and is zoned B-4 (Business). Parcel 3 contains 16.415 acres and is zoned B-4 (Business), and R-15S (Residential)). Parcel 4 contains 0.086 acres and is zoned R-15S (Residential)).

10. The Property fronts on Great Bridge Road to the east and Fernwood Farms Road to the west. Surrounding land uses are a mixture of single-family attached and detached residential units and multi-family residential units.

11. The Property is adjacent to the Fernwood Farms, Fernbridge and Driftwood Farms developments to the south, and the Riverwalk development to the east. Based upon information and belief, Fernwood Farms was developed in the mid-1960s. Fernbridge was developed in the mid-2000s. Riverwalk was developed as a planned unit development and contains single family residences, townhomes, duplex and multi-plex condominiums. The various neighborhoods that make up the Riverwalk development were built from approximately 1986 through the late 1990s.

12. Across Great Bridge Boulevard, the Hunters Glen, Wickford, Les Chateaux and Glenleigh developments were established from approximately 1985 through the late 1990s. These developments consist of either townhomes or condominiums. And nearby the Property, the City approved the 2009 construction of a large apartment complex named The Pillars at Great Bridge, in a much higher density and traffic area, off North Battlefield Boulevard.

B.   *Property Zoning History*

13. On February 25, 2014, the City adopted an updated comprehensive plan entitled "Moving Forward – Chesapeake 2035" (the "Comprehensive Plan"). The updated Comprehensive Plan was adopted following an extensive review process that began in 2009.[1] The 2035 Land Use Plan that is included in the Comprehensive Plan identifies the Property as being located in the City's Urban Overlay District ("UOD"). Within the UOD, the Property is designated as low-density residential, and is surrounded by high-residential, medium-residential

---

[1] *See* http://www.cityofchesapeake.net/government/city-departments/departments/Planning-Department/moving-forward-2035.htm.

and business/commercial uses. The UOD guidelines define low-density residential as constituting up to eight (8) dwelling units per acre.

14. In June 2016, the Owners filed a rezoning application with the City seeking to rezone various portions of the Property to R-MF1 (Multifamily Residential), B-1 (Neighborhood Business), or C-1 (Conservation), in order to develop a combination of 213 apartments, 170 townhome-style condominiums, and 10,000 square feet of commercial space (the "2016 Application"). The remaining 60+ acres would be rezoned to a conservation district and remain undisturbed. The overall proposed density was 4.16 units per acre (below the eight (8) units/acre identified as low-density residential in the Comprehensive Plan).

15. Following a detailed review of the 2016 Application, the City's Planning Staff ("Staff") recommended approval of the 2016 Application, subject to fifteen (15) proffers submitted by the Owners. Staff's recommendation was based on findings, including the following:

   a. The 2016 Application satisfied the City's "Planning and Land Use Policy" which requires that a rezoning application must satisfy level of service ("LOS") standards related to i) school needs, ii) road capacity, and iii) sewer capacity, or "the application will be presumed to be untimely and inappropriate;"

   b. The 2016 Application satisfied the standards set forth in Section 16-106 of the Zoning Ordinance [Hearing and Action by the Planning Commission];

   c. The proposed zoning district reclassification was consistent with the Comprehensive Plan; and

   d. The proposed use was compatible with the surrounding community.

16. Prior to its being considered by the Planning Commission, the Owners amended the 2016 Application to remove the proposed apartments and decrease overall density to a total of 293 townhouse style condominium units. The commercial use component remained the same.

17. An updated Staff Report determined that the revised 2016 Application satisfied the City's LOS criteria, was consistent with the Comprehensive Plan, and was compatible with the surrounding community.

18. Following a public hearing held on October 11, 2017, the Planning Commission forwarded a recommendation of approval of the 2016 Application to Council.

19. On November 21, 2017, Council held a public hearing on the 2016 Application, and residents from the surrounding neighborhoods spoke against the proposed development. After the hearing, Council voted to deny the 2016 Application based on 1) community opposition and 2) the existing zoning classification's not precluding all development of the Property.

20. Following Council's denial of the 2016 Application, Council approved the "Knell's Ridge" rezoning which authorized the development of 151 units on property located approximately 1.3 miles from the Property.

21. In 2018, the Owners filed a new rezoning application for the Property which further reduced the proposed density of the project to 153 single family and townhouse units, and included 11,300 square feet of commercial space. The remainder of the Property (approximately 60+ acres) would be rezoned for conservation (the "2018 Application"). The reduced density equates to five (5) units per acre (well below the eight (8) units/acre qualifying as low-density residential in the UOD guidelines). The 2018 Application also included substantial proffers (the "Proffers"). A copy of the concept plan which was included as part of

the 2018 Application and is part of the legislative record is attached hereto as **Exhibit A** (entitled "Fernwood Chase Concept Plan – October 23, 2019").

22. Following a detailed review of the 2018 Application, the City's Planning Staff recommended approval of the 2018 Application, subject to the Proffers. Staff's recommendation was based on multiple findings, including the following:

   a. The 2018 Application satisfied the City's "Planning and Land Use Policy" and the LOS standards related to i) school needs, ii) road capacity, and iii) sewer capacity to a greater extent than the 2016 Application;

   b. The 2018 Application satisfied the standards set forth in Section 16-106 of the Zoning Ordinance;

   c. The proposed zoning district reclassification was consistent with the Comprehensive Plan; and

   d. The proposed use was compatible with the surrounding community.

23. Following a public hearing held on November 13, 2019, the Planning Commission forwarded a recommendation of approval of the 2018 Application to Council.

24. On January 21, 2020, Council held a public hearing on the 2018 Application. A number of residents from the surrounding developments spoke against the application, primarily citing i) occurrences of flooding in the general area and a concern that the new development would make existing drainage problems worse, and ii) increased traffic making existing traffic congestion worse.

25. Following the close of the public hearing, Councilmember S.Z. "Debbie" Ritter moved to deny the 2018 Application and proffered her reasons for denial. Based on the legislative record, Ms. Ritter opposed the application because i) she believed that the City's LOS standards were "outdated," ii) she believed the Property could be developed under its current

zoning even if it would be contrary to the Comprehensive Plan, and, iii) the Property was in a "Sensitive Drainage Area."[2]  Ms. Ritter acknowledged, however, that the residential developments in the area that experienced flooding issues were built prior to the enactment of the state's floodplain and drainage (i.e. stormwater management) regulations.  She further acknowledged that these current regulations would apply to the 2018 Application and that while the regulations did not require that a new development must make existing drainage any better, the development could not make it any worse.  *See* **Exhibit B**.

      26.    Prior to Council's voting on the application, the City's Director of Development and Permits and its designated Floodplain Administrator, James B. Tate, was asked to address the drainage issue as well.  The following exchange occurred between Councilmember Robert C. Ike, Jr., and Mr. Tate:

Mr. Ike:    Mr. Tate.  Drainage seems to be a big issue tonight.  What is the actual issue?  Is this property, is this application going to exacerbate or increase the flooding in this area?  What is your staff's professional opinion?

Mr. Tate:    I work closely with Public Works.  So we review the development plans with the sole purpose to make sure like Ms. Ritter indicated that there is no detrimental impact, but we are also familiar with how the existing systems around the area work because we work so closely with Public Works.  And what I would tell you is there's a lot of areas directly around here that are significantly challenged by the elevation of the land that was developed years and years ago.  And as a result of that there's tidal flooding with or without rain and those people they do receive flooding frequently but no matter how well you develop the remaining undeveloped areas, you're not going to improve their situation short of either retreating in buying properties which the Fire Department has, you know, pursued through some FEMA grants or elevating the property and there's been some houses raised and things like that.  This project could be designed with the development criteria so that it wouldn't have a detrimental effect.

*See* **Exhibit B** at 4.

---

[2] *See* http://chesapeake.granicus.com/player/clip/9144, discussion of Fernwood Chase, at 2:16-2:32 (transcribed for reference and attached as **Exhibit B**).

27. In seconding the motion to deny the 2018 Application, Councilmember Dr. Ella Ward cited her general concerns with sea level rise and the flooding that residents had experienced over the last 15 to 20 years. See **Exhibit B** at 2. No other council member gave any additional reason for voting to deny the 2018 Application, which motion was carried on a vote of 7-2.

28. From the legislative record, the reasons Council denied the 2018 Application were based on i) concerns that the LOS standards were "outdated," ii) the Owners' ability to develop the Property under its existing "stale" zoning, even if that development is contrary to the Comprehensive Plan, and iii) concerns with localized flooding and deficient drainage infrastructure in the area.

29. The LOS standards were adopted on March 21, 1995. They have been updated repeatedly since then, with major amendments occurring in 1997, 2001, 2004, 2012, and 2015. Thus, the LOS Standards are not "outdated" because of their adoption in 1995, particularly as the standards have been amended significantly since that time.

30. None of the council members who voted to deny the 2018 Application cited any failure by Plaintiffs to satisfy any of the LOS standards. No evidence was presented that the 2018 Application did not satisfy the LOS standards. Based on the record before Council, the 2018 Application met all of the LOS standards.

31. With regard to the adequacy of the current zoning of the Property, although the Property may be developed under its current zoning, its existing zoning classification is no longer reasonable or appropriate, as evidenced by, *inter alia*, the Comprehensive Plan, the reclassification requirements set forth in the Zoning Ordinance, and the pattern of development that has occurred in the area for decades.

32. With regard to concerns regarding occurrences of flooding in the area and whether the development would exacerbate drainage deficiencies, the record before Council established that the Owners' proposed development could, and was legally required to, be designed so as to not have any detrimental effect on down-stream and/or surrounding properties.

33. As a matter of law, the proposed development on the Property is required to comply with, *inter alia*, the City's Stormwater Management & Drainage Design requirements, the City's Master Drainage Plan, the City's Public Facilities Manual and the Virginia Stormwater Management Handbook.

34. The City Engineer advised that if the 2018 Application were approved, the Owners would be required to provide adequate drainage for the proposed development and the upstream watershed along or through the ultimate development of the Property.

35. Based on current FEMA Flood Zones maps from the City's website, the majority of the developed portion of the Property would be located outside of the FEMA floodplain, while the majority of the surrounding neighborhoods, including Fernwood Farms, Fernbridge, Driftwood Meadows and Riverwalk, are located in the AE floodzone. *See* **Exhibit C**, map entitled "Subdivisions – Chesapeake Area Flood Zones Layer from FEMA" (the "FEMA Map"), and showing the general location of the proposed development on the FEMA Map.

36. Council ignored that the proposed development of the Property was required to address and satisfy stormwater and drainage criteria, and did so; Council was swayed, instead, by residents whose own properties were admittedly not subject to these same controls, and which are located in the FEMA floodplain.

**COUNT ONE—CLAIM UNDER 42 U.S.C. § 1983**
**(VIOLATION OF EQUAL PROTECTION)**

37. Owners reallege and incorporate the allegations of ¶¶ 1-36 of this Complaint as if set forth herein in their entirety.

38. Section 1983 of Title 42 of the United States Code provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

39. Council is a person for purposes of § 1983 and is liable in that respect for its legislative acts.

40. Council denied the 2018 Application under the color of the law of the Commonwealth of Virginia and the City of Chesapeake – including, but not limited to – various sections of Chapter 22, Title 15.2 of the Code of Virginia, which grant municipalities certain authority to enact and enforce zoning ordinances and conditional zoning, as well as various sections of the City's Zoning Ordinance and/or Comprehensive Plan.

41. Denying the 2018 Application when other developments, including Riverwalk, Hunters Glen, Wickford, Les Chateaux, Glenleigh and Knell's Ridge, were all approved by Council violated the Owners' right to Equal Protection under the Fourteenth Amendment to the United States Constitution, and was arbitrary, capricious and unreasonable.

42. Council's treatment of the Owners' Property differently than those similarly-situated developments has no rational basis and is not substantially related to the health, safety, or welfare of the City.

43. Council intentionally and purposefully discriminated against Owners in denying the 2018 Application.

44. Owners were injured as a result of the unconstitutional denial of their rezoning application in the form of, among other things, incurring substantial out-of-pocket expenses for the application and related engineering work, delay in developing the Property, and lost profits.

**COUNT TWO—CLAIM UNDER VA. CODE ANN. § 15.2-2208.1**

45. Owners reallege and incorporate the allegations of ¶¶ 1-44 of this Complaint as if set forth herein in their entirety.

46. Section 2208.1.A of Title 15.2 of the Code of Virginia states that:

> Notwithstanding any other provision of law, general or special, any applicant aggrieved by the grant or denial by a locality of any approval or permit, however described or delineated, including a special exception, special use permit, conditional use permit, rezoning, site plan, plan of development, and subdivision plan, where such grant included, or denial was based upon, an unconstitutional condition pursuant to the United States Constitution or the Constitution of Virginia, shall be entitled to an award of compensatory damages and to an order remanding the matter to the locality with a direction to grant or issue such permits or approvals without the unconstitutional condition and may be entitled to reasonable attorney fees and court costs.

47. As described above, Council denied the 2018 Application in violation of Owners' Equal Protection rights under the Fourteenth Amendment to the United States Constitution.

48. On January 21, 2020, during the public hearing and immediately prior to Council's vote to deny the 2018 Application, Owners objected to the impending denial, refuting all potential reasons which might be cited as the basis for such denial. Owners' objections are set forth in the written remarks of Owners' agent, W. P. Burkhimer, Jr., which were read into and are a part of the legislative record.

49. Pursuant to Va. Code § 15.2-2208.1, Owners are entitled to compensatory damages for their above losses and expenses, and an order directing City Council to reconsider

the 2018 Application consistent with the Court's determinations, and recovery of Owners' court costs and attorneys' fees.

### COUNT THREE—CLAIM UNDER 28 U.S.C. § 2201
### (DECLARATORY JUDGMENT)

50. Owners reallege and incorporate the allegations of ¶¶ 1-49 of this Complaint as if set forth herein in their entirety.

51. An actual controversy exists as Council has refused to correct the arbitrary and unconstitutional denial of the 2018 Application.

52. Owners are entitled to a declaratory judgment, declaring their constitutional and statutory rights have been violated, and declaring Council's denial of the 2018 Application is void.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

(1) Enter a declaratory judgment in their favor declaring that the Council's decision to deny the 2018 Application is void, on the grounds that it was arbitrary, capricious, unreasonable, and unconstitutional;

(2) Order Council to reconsider the 2018 Application for rezoning, consistent with this Court's determination;

(3) Award Owners their court costs and attorneys' fees expended in this cause pursuant to, among other sources, 42 U.S.C. § 1983 and Va. Code § 15.2-2208.1;

(4) Award Owners compensatory damages caused by Council's improper and unconstitutional denial of the 2018 Application for rezoning, pursuant to 42 U.S.C. § 1983, in the amount of $1,000,000 or other such sum as determined by the Court; and,

(4) Grant such other relief as the Court deems appropriate.

Owners demand trial by jury on all claims so triable.

>Respectfully submitted,
>
>**SAS ASSOCIATES 1, LLC AND MILITARY 1121, LLC,**
>
>By: */s/ Robert W. McFarland*
>Robert W. McFarland (VSB # 24021)
>Micaylee A. Noreen (VSB # 92433)
>MCGUIREWOODS LLP
>World Trade Center
>101 West Main Street, Ste. 9000
>Norfolk, Virginia 23510
>Phone: (757) 640-3716
>Fax: (757) 640-3966
>rmcfarland@mcguirewoods.com
>mnoreen@mcguirewoods.com
>
>M. Ann Neil Cosby (VSB # 42682)
>MCGUIREWOODS LLP
>Gateway Plaza
>800 East Canal Street
>Richmond, Virginia 23219
>Phone: (804) 775-7737
>Fax: (804) 775-1061
>acosby@mcguirewoods.com
>
>*Counsel for Plaintiffs SAS Associates 1, LLC and Military 1121, LLC*