

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SAS ASSOCIATES 1, LLC,
and MILITARY 1121, LLC,

      Plaintiffs,

v.                                                   CIVIL ACTION NO. 2:21-cv-491

CITY COUNCIL FOR THE
CITY OF CHESAPEAKE,
VIRGINIA,

      Defendant.

### *MEMORANDUM OPINION AND ORDER*

Before the Court is Defendant City Council for the City of Chesapeake, Virginia's ("Defendant" or "Council") Motion to Dismiss. Def.'s Mot. Dismiss, ECF No. 7. Defendant moves to dismiss, in its entirety, Plaintiffs SAS Associates 1, LLC ("SAS") and Military 1121, LLC's ("Military") (collectively, "Plaintiffs" or "Owners") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.* The Court has considered the memoranda of the parties and this matter is now ripe for determination. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 8 ("Def.'s Mem. Supp."); Pls.'s Mem. Opp'n to Def.'s Mot. Dismiss, ECF No. 10 ("Pls.'s Mem. Opp'n"); Def.'s Reply to Pls.'s Mem. Opp'n to Def.'s Mot. Dismiss, ECF No. 15 ("Def.'s Reply"). Upon review, the Court finds that a hearing on this Motion is not necessary. *See* E.D. VA. LOCAL CIV. R. 7(J). For the reasons stated herein, Defendant's Motion to Dismiss is **GRANTED**.

### I.    FACTUAL AND PROCEDURAL HISTORY

On September 1, 2021, Plaintiffs filed a Complaint against Defendant, alleging a violation of the Equal Protection Clause, a violation of Virginia Code § 15.2-2208.1, and entitlement to declaratory judgment. *See* Compl., ECF No. 1. Relevant to Defendant's Motion to

Dismiss and stated in the light most favorable to Plaintiffs, the following facts are drawn from the Complaint and attachments thereto. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

SAS is a Virginia limited liability company (LLC) with its principal place of business in Virginia Beach, Virginia. Compl. at ¶ 1. Military is a Virginia LLC with its principal place of business in Chesapeake, Virginia. *Id.* at ¶ 2. The City of Chesapeake, Virginia ("City") is an independent city chartered by the General Assembly of Virginia. *Id.* at ¶ 5. Defendant is the legislative branch of the City government. *Id.* at ¶ 6. SAS was the applicant in a rezoning case filed in the City related to the proposed development of several parcels of property (collectively, "Property") that both Plaintiffs own. *Id.* at ¶ 3-4. The Property consists of 90.58 acres of land. *Id.* at ¶ 9. Parcel 1 contains approximately 76.391 acres and has mixed zoning, including R-15S (Residential), B-4 (Business), and A-1 (Agricultural). *Id.* Parcel 2 contains 0.344 acres and is zoned Business. *Id.* Parcel 3 contains 16.415 acres and is zoned Business and Residential. Parcel 4 contains 0.086 acres and is zoned Residential. *Id.* The surrounding land consists of single-family attached and detached residential units, and multi-family residential units. *Id.* at ¶ 10.

On February 25, 2014, the City adopted an updated comprehensive plan, entitled "Moving Forward – Chesapeake 2035" ("Comprehensive Plan"), following an extensive review process that began in 2009.[1] *Id.* at ¶ 13. The 2035 Land Use Plan included in the Comprehensive Plan identifies the Property as being located in the City's Urban Overlay District ("UOD"). *Id.* Within the UOD, the Property is designated as low-density residential and is surrounded by high-residential, medium-residential, and business/commercial uses. *Id.* The UOD guidelines define low-density residential as constituting at most eight (8) dwelling units per acre. *Id.*

---

[1] *See Comprehensive Plan 2035*, CITY OF CHESAPEAKE, https://www.cityofchesapeake.net/government/city-departments/departments/Planning-Department/moving-forward-2035.htm (last visited May 5, 2022). For the purposes of a Rule 12(b)(6) motion, the Court may rely upon documents attached to the Complaint as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985).

2

In June 2016, Plaintiffs filed a rezoning application with the City, seeking to rezone various portions of the Property to R-MF1 (Multifamily Residential), B-1 (Neighborhood Business), or C-1 (Conservation) ("2016 Application"). *Id.* at ¶ 14. The City's Planning Staff ("Staff") recommended approval of the 2016 Application. *Id.* at ¶ 15. Following a public hearing on October 11, 2017, the Planning Commission forwarded a recommendation of approval of the 2016 Application to Defendant. *Id.* at ¶ 18. On November 21, 2017, Defendant held a public hearing on the 2016 Application and residents from surrounding neighborhoods spoke against the proposed development. *Id.* at ¶ 19. After the hearing, Defendant voted to deny the 2016 Application based on community opposition and that the existing zoning classification did not preclude all development of the property. *Id.* After Defendant's denial of the 2016 Application, it approved the Knell's Ridge rezoning, which authorized the development of 151 units of property located approximately 1.3 miles from Plaintiff's Property. *Id.* at ¶ 20.

In 2018, Plaintiffs filed a new rezoning application for the Property, which reduced the proposed density of the project, as proposed in 2016, to 153 single family and townhouse units, and included 11,300 square feet of commercial space. *Id.* at ¶ 21. The remainder of the Property would be rezoned for conservation ("2018 Application" or "Application"). *Id.* The reduced density equates to five (5) units per acre. *Id.* The 2018 Application also included substantial proffers. *Id.* Following a detailed review, the Staff recommended approval of the 2018 Application, subject to the proffers. *Id.* at ¶ 22. The Staff's recommendation was based on the following findings: (1) the Application satisfied the City's "Planning and Land Use Policy" and the City's level of service ("LOS") standards related to school needs, road capacity, and sewer capacity, to a greater extent than the 2016 Application; (2) the Application satisfied the standards set forth in Section 16-106 of the Zoning Ordinance; (3) the proposed zoning district

3

reclassification was consistent with the Comprehensive Plan; and (4) the proposed use was compatible with the surrounding community. *Id.* Following a public hearing on November 13, 2019, the Planning Commission forwarded a recommendation of approval of the 2018 Application to Defendant. *Id.* at ¶ 23.

On January 21, 2020, Defendant held a public hearing on the 2018 Application.[2] *Id.* at ¶ 24, n.2. Residents from surrounding developments spoke against it, primarily citing occurrences of flooding in the general area and concerns that the new development would worsen existing drainage and traffic congestion problems. *Id.* After the close of the hearing, Councilmember S.Z. "Debbie" Ritter moved to deny the Application. *Id.* at ¶ 25. Councilmember Dr. Ella Ward seconded the motion. *Id.* at ¶ 27. Prior to Defendant's vote, Councilmember Robert C. Ike, Jr. asked James B. Tate, the City's Director of Development and Permits and designated Floodplain Administrator, to address whether the Property would "exacerbate or increase the flooding in this area." *Id.* at ¶ 26. Mr. Tate opined, in relevant part, that "no matter how well you develop the remaining undeveloped areas, you're not going to improve the[] situation short of either retreating in buying properties which the Fire Department has . . . pursued through some FEMA grants or elevating the property." *Id.* He concluded that "[t]his project could be designed with the development criteria so that it wouldn't have a detrimental effect." *Id.*

Defendant voted 7-2 to deny the Application. *Id.* at ¶ 27. From the legislative record, Defendant denied the Application based on: (1) concerns that the LOS standards were "outdated"; (2) Plaintiffs' ability to develop the Property under its existing "stale" zoning, even if that development is contrary to the Comprehensive Plan; and (3) concerns with localized flooding and deficient drainage infrastructure in the area. *Id.* at ¶ 28. Plaintiffs contest the merits

---

[2] Video of Chesapeake City Council Meeting, CITY OF CHESAPEAKE 1:30:45-2:41:52 (Jan. 21, 2020), http://chesapeake.granicus.com/player/clip/9144?&redirect=true ("Council Meeting"). The Court may rely upon documents attached to the Complaint as exhibits or incorporated by reference. *See Simons*, 762 F.2d at 31.

of each of Defendant's reasons. *Id.* at ¶¶ 29-35. Plaintiffs allege that Defendant ignored that the proposed development of the Property was required to, and did, in fact, address and satisfy stormwater and drainage criteria. *Id.* at ¶ 36. Plaintiffs allege that, instead, Defendant was "swayed by residents whose own properties were admittedly not subject to these same controls, and which are located in the [Federal Emergency Management Agency] FEMA floodplain." *Id.*

Accordingly, Plaintiffs assert three counts against Defendant:

Count 1.   Equal Protection Violation Under 42 U.S.C. § 1983 (Compl. at ¶¶ 37-44);

Count 2.   Claim Under Virginia Code Ann. § 15.2-2208.1 (Compl. at ¶¶ 45-49);

Count 3.   Declaratory Judgment Under 28 U.S.C. § 2201 (Compl. at ¶¶ 50-52).

Defendant moves to dismiss Plaintiffs' Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Mot. Dismiss; Def.'s Mem. Supp.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted. For the purposes of a Rule 12(b)(6) motion, courts may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A complaint need not contain "detailed factual allegations" in order to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on

5

its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 557). To achieve factual plausibility, plaintiffs must allege more than "naked assertions . . . without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Id.*

### III. DISCUSSION

#### A. Count One – Equal Protection Violation Under 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983,[3] a plaintiff must allege that (1) the defendant violated "a right secured by the Constitution or laws of the United States," and (2) acted "under color of state law" in so doing. *West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) (overruled in part on other grounds)). If either element is missing, the complaint fails to state a claim for relief under § 1983. A plaintiff must also establish that the violation caused them injury. *See Coppage v. Mann*, 906 F. Supp. 1025, 1035 (E.D. Va. 1995);

---

[3] 42 U.S.C.A. § 1983 provides in full:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

*see also* 42 U.S.C. § 1983 ("Every person who, under color of [state law] . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any [constitutional] rights . . . shall be liable to the party *injured*.") (emphasis added).

Here, Plaintiffs allege that Defendant, acting under the laws of the Commonwealth of Virginia and the City of Chesapeake, violated their right to Equal Protection under the Fourteenth Amendment of the United States Constitution by arbitrarily, capriciously, and unreasonably denying their 2018 Application. Compl. at ¶¶ 40-41. Plaintiffs allege that Defendant treated their Property differently than similarly situated developments without any rational basis. *Id.* at ¶¶ 41-42. Moreover, Plaintiffs allege that Defendant intentionally and purposefully discriminated against them by denying the Application, and that they were injured as a result. *Id.* at ¶¶ 43-44. Defendant moves to dismiss Count I for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Def.'s Mem. Supp. at 4-14. Specifically, Defendant does not dispute that it acted under color of state law, but argues that it had a rational basis for denying the Application, Plaintiffs failed to adequately plead intentional and purposeful discrimination, and Plaintiffs failed to sufficiently identify similarly situated property owners. *Id.*

As a preliminary matter, while Plaintiffs correctly contend that their burden at the motion to dismiss stage is considerably lower than that required at the summary judgment stage, they nonetheless misunderstand it. *See* Pls.' Mem. Opp'n at 5-8. Specifically, Plaintiffs argue that they are entitled to survive a motion to dismiss even if they "ma[ke] only conclusory allegations, and aver[] no specific facts, regarding the treatment of others similarly situated or about the [defendant's] motives." *Id.* at 7 (citing *High Peak Partners, LLC v. Bd. of Supervisors of Prince George Cnty., VA*, No. 3:07CV757-HEH, 2008 WL 1733605, at *11 (E.D. Va. Apr. 14, 2008)). Plaintiffs' argument that they must do nothing more than allege legal conclusions without any

7

supporting factual allegations is unpersuasive in light of established United States Supreme Court precedent, United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") precedent, and the Federal Rules of Civil Procedure. *See Twombly*, 550 U.S. at 570 (To survive a motion to dismiss, a complaint must incorporate "enough facts to state a belief that is plausible on its face."); *E. Shore Mkts.*, 213 F.3d at 180 (A court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments."); FED. R. CIV. P. 12(b)(6) ("[F]ailure to state a claim upon which relief can be granted.").[4] Thus, at this stage in litigation, Plaintiffs bear a heavier burden than merely advancing legal conclusions.

The Equal Protection Clause of the Fourteenth Amendment prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The standard, however, is not "that persons in different circumstances cannot be treated differently under the law." *Id.* Rather, "classification for the purposes of legislation . . . must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *F.S. Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920). The Supreme Court has recognized that a plaintiff may bring a successful equal protection claim as a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the

---

[4] *But see High Peak*, 2008 WL 1733605, at *11 ("[Plaintiffs] have not specifically pled which similarly situated parties were treated differently by [defendants]. Nor does their Complaint provide a glimpse of any evidence to support the allegation that [defendants'] actions were improperly motivated. They need not do so, however, at this stage of the litigation.").

difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (collecting cases). "In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *Twombly*, 550 U.S. at 560-61). Plaintiffs fail to meet this burden. *Id.*

First, while Plaintiffs name other developments that Defendant has approved, and thus treated differently, they fail to establish that they are similarly situated. Specifically, Plaintiffs allege that "[d]enying the 2018 Application when other developments, including Riverwalk, Hunters Glen, Wickford, Les Chateaux, Glenleigh and Knell's Ridge, were all approved . . . was arbitrary, capricious and unreasonable." Compl. at ¶ 41. Yet, Plaintiffs themselves acknowledge that all but Knell's Ridge were developed before the year 2000 and are only residential. *See id.* at ¶¶ 10-12 (all named developments were established between 1985 and the late 1990s; Riverwalk consists of single-family residences, townhomes, duplex and multi-plex condominiums; Hunters Glen, Wickford, Lex Chateaux and Glenleigh consist of either townhomes or condominiums).[5] Although Defendant approved Knell's Ridge in 2016 instead of Plaintiffs' Property, the only information Plaintiffs offer regarding Knell's Ridge is that Defendant "authorized the development of 151 units on property located approximately 1.3 miles" away from Plaintiffs' Property. *Id.* at ¶ 20. Moreover, Plaintiffs provide no information regarding the size, density, community response, or the flooding impact of those developments. *See id.* at ¶ 35

---

[5] The Court notes that Plaintiffs include other developments in the factual allegations of their Complaint beyond those named in paragraph 41. *See* Compl. at ¶¶ 10-12. Even considering those, however, Plaintiffs' contention remains unpersuasive because those developments were also developed many years before 2018 and are only residential. *See id.* (Fernwood Farms was developed in the mid-1960s; Fernbridge was developed in the mid-2000s; The Pillars apartment complex was approved in 2009 and is located in a higher density and traffic area).

9

(distinguishing that the majority of the developed portion of the Property would be located outside the FEMA floodplain, while the majority of the surrounding neighborhoods are located in the "AE floodzone," but failing to discuss *how* those developments are similar or different in their impact on the drainage issue in the City).

In contrast, Plaintiffs applied to develop their Property in 2016 and 2018, seeking to rezone various portions of over 90 acres of land to multifamily residential, neighborhood business, or conservation, in order to develop both residential single-family townhome-style units and business commercial space. *Id.* at ¶¶ 9, 14, 16, 21. Local residents spoke in opposition to both Plaintiffs' 2016 and 2018 Applications. *Id.* at ¶¶ 19, 24. In 2018, residents and council members expressed concern regarding the impact of Plaintiffs' development on existing flooding and traffic congestion problems. *Id.* at ¶¶ 24-25, 27-28. The Court therefore recognizes significant differences between Plaintiffs' Property and the developments named in the Complaint. Plaintiffs have thus failed to allege sufficient facts demonstrating that they are similarly situated to the developments that Defendant allegedly approved.

Second, even if these developments were similarly situated, Plaintiffs' claim would still fail because they have not pled sufficient facts to demonstrate that the alleged unequal treatment resulted from discriminatory animus. *Equity In Athletics*, 639 F.3d at 108. "To prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another." *Sylvia*, 48 F.3d at 819 (citing *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)). "A violation is established only if the plaintiff can prove that the state *intended* to discriminate." *Id.* (emphasis in original). "Discriminatory purpose implies more than 'awareness of consequences'; rather, a plaintiff must show that the decisionmaker 'selected or reaffirmed a particular course of action at least in part 'because of' . .

10

. its adverse effects upon an identifiable group.'" *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., Virginia*, 854 F. App'x 521, 532 (4th Cir. 2021) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985); *cf. Olech*, 528 U.S. at 562 (affirming viability of class-of-one equal protection claim)). The Fourth Circuit has recognized several non-exclusive factors "as probative of whether a decision[-]making body was motivated by a discriminatory intent":

> "(1) evidence of a 'consistent pattern' of actions by the decision[-]making body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decision[-]making body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings."

*Sylvia*, 48 F.3d at 819 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). Plaintiffs rely primarily on "the specific sequence of events leading up to" Defendant's decision and "contemporary statements by decisionmakers on the record." *Id.*

Under Count I, Plaintiffs allege that Defendant "intentionally and purposefully discriminated against [them] in denying the 2018 Application." Compl. at ¶ 43. Beyond this legal conclusion, however, the Court is strained to decipher any discriminatory intent. Rather, during the public hearing on January 21, 2020, Plaintiffs acknowledge that "[a] number of residents from the surrounding developments spoke against the application, primarily citing i) occurrences of flooding in the general area and a concern that the new development would make existing drainage problems worse, and ii) increased traffic making existing traffic congestion worse." Compl. at ¶ 24. Specifically, thirteen residents stood up to speak during the hearing in opposition to the 2018 Application and zero residents spoke in support.[6] One resident also explained to Defendant that several audience members behind him – some of whom spoke and some of whom

---

[6] Council Meeting, *supra* note 2, at 1:31:35-35:05, 1:43:45-2:15:43.

11

did not – were wearing "orange sticker[s]" to signal that they were "in opposition of this project."[7] After that resident concluded his remarks and the audience began to applaud, Mayor West asked them to "please hold your applause" because it was disruptive to the efficiency of the proceedings, but he acknowledged that "we see your signs, [and] we know where you are."[8] Defendant also provided Plaintiffs' representative, Mr. Pete Burkheimer, three separate opportunities to speak in support of the merits of the 2018 Application, in response to the concerns of the residents who spoke in opposition, and in support of a hearing continuance.[9]

After the hearing, Councilmember Ritter moved to deny the Application "because i) she believed that the City's LOS standards were 'outdated,' ii) she believed the Property could be developed under its current zoning even if it would be contrary to the Comprehensive Plan, and, iii) the Property was in a 'Sensitive Drainage Area.'" *Id.* at ¶ 25. Councilmember Ritter acknowledged, however, that the residential developments in the area that experienced flooding issues were built prior to the enactment of the state's floodplain and drainage regulations. *Id.* Further, she acknowledged that the current regulations would apply to the 2018 Application and that, pursuant to those regulations, the development was prohibited from making existing drainage issues any worse. *Id.* Councilmember Ward seconded the motion, "cit[ing] her general concerns with the sea level rise and the flooding that residents had experienced over the last 15 to 20 years." *Id.* at ¶ 27. "No other council member gave *any* additional reason for voting to deny the 2018 Application, which motion was carried on a vote of 7-2." *Id.* (emphasis added).

While Plaintiffs challenge the merits of the reasons stated on the record, these challenges evidence a substantive disagreement with the bases for Defendant's decision, not discriminatory

---

[7] *Id.* at 1:43:45-44:03.
[8] *Id.* at 1:45:15-45:31.
[9] *Id.* at 1:37:09-43:19 (2018 Application merits), 2:26:26-30:18 (response to residents' concerns), 2:33:08-40:04 (hearing continuance).

12

intent. *See id.* at ¶¶ 29-35 (arguing the LOS standards are not "outdated," the 2018 Application met all of the LOS standards, the Property's existing zoning classification is no longer reasonable or appropriate, Plaintiffs were legally required to design the Property to not make the drainage problem worse, and the majority of the developed portion of the Property would be located outside of the FEMA floodplain). Plaintiffs conclude that Defendant "ignored that the proposed development of the Property was required to address and satisfy stormwater and drainage criteria, and did so." *Id.* at ¶ 36. Plaintiff argues that Defendant "was swayed, instead, by residents whose own properties were admittedly not subject to these same controls, and which are located in the FEMA floodplain." *Id.* Yet, Plaintiffs fail to allege or explain that any of the reasons Defendant offered, or the fact that Defendant voted in accordance with the opinion of the community, derive from or demonstrate a discriminatory intent. In other words, although Plaintiffs make the plain allegation that Defendant intentionally discriminated against them in their Complaint, they fail to connect *any* of Defendant's actions, comments, or stated reasons to a discriminatory purpose.

The excerpted transcript of the Chesapeake City Council Meeting that Plaintiffs attach to the Complaint only supports the Court's finding. *See* Compl. at Ex. B.[10] Specifically, Councilmember Ritter, while explaining her reasons for advancing a motion to deny the Application, stated that, while she agrees that the project is possible, "[u]nfortunately, what's happened over the years is more an issue of changing regulations than it is being able to build something." *Id.* at 1. She mentioned that the policies that guide the Council's decision are not binding, the drainage issues, and the community's concern "about the school, it particularly being Williams which appears to be the problem," which affects traffic. *Id.* at 1-2. Her

---

[10] For the purposes of a Rule 12(b)(6) motion, the Court may rely upon documents attached to the Complaint as exhibits or incorporated by reference. *See Simons*, 762 F.2d at 31.

13

commentary therefore indicates that while she acknowledged the Application is possible, she believed that "this isn't the right time . . . [and,] [u]nfortunately . . . the time is very difficult in sensitive areas like this for any area of the city." *Id.* at 2. Councilmember Ward concurred with Councilmember Ritter and added: "I especially empathize with so many who have been through so much and lost so much – your cars, your carpet, your ground level floors, you know over the last 15 and 20 years." *Id.* She concluded that she supported the denial of the Application because "[w]e've got to make sure that our citizens are protected . . . [a]nd these are circumstances over which you don't have any control when it comes to water." *Id.* Rather than explain how or why these reasoned explanations evidence discriminatory animus, however, Plaintiffs rely on the commentary of Mr. Tate regarding the drainage issue. Compl. at ¶ 26. Yet, Mr. Tate's statement that Plaintiffs' "project could be designed with the development criteria so that it wouldn't have a detrimental effect" was the only supportive contention offered to Defendant, apart from Mr. Burkheimer's own remarks. *Id.* at Ex. B, at 4. Further, the mere possibility of Plaintiffs' project does not entitle it to approval nor, alone, evidence that Council acted unconstitutionally.

Ultimately, looking solely to the contents of the Complaint, the Court understands Plaintiffs to disagree with Defendant's decision to favor the community's opinion of the 2018 Application over its alleged actual merits. Plaintiffs fail to explain, however, whether or how Defendant's reliance on the negative community response is unconstitutional. Indeed, the Court finds that it is not impermissible, but rather highly appropriate for Defendant, as an elected government body, to consider the opinions of the constituents for whom they serve and represent, especially regarding the matter of the structure and safety of their homes and community. *See Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 329 (4th Cir. 2005) ("[E]vidence that the Board and City Council responded to the public opposition does

14

not rise to the level of a Constitutional violation, because we have recognized that matters of zoning are inherently political, and that it is a zoning official's responsibility to mediate disputes between developers, and local residents."). Plaintiffs also do not allege any facts that allow the Court to impute any impermissible motive of the community, assuming it existed, onto Defendant. *See Sylvia*, 48 F.3d at 824 ("While the discriminatory motivations of people who testify before a decision[-]making board might in limited circumstances be probative of the board's motivations, this could be true only where public testimony was overwhelmingly opposed to a proposal for a distinct discriminatory reason, and board members were clearly swayed by that public opposition, fully aware of its basis in discrimination and prejudice.") Moreover, even if Defendant relied in good faith on what are, in fact, meritless reasons when denying Plaintiffs' 2018 Application, the record demonstrates that council members at least "reasonably could have believed that the action was rationally related to a legitimate governmental interest." *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va.*, 135 F.3d 275, 290 (4th Cir. 1998).

In short, the sequence of events leading up to Defendant's decision and the legislative record do not, even in the light most favorable to Plaintiffs, evidence any discriminatory intent. *See Sylvia*, 48 F.3d at 819. Thus, the Court finds that Plaintiff has failed to "plead sufficient facts to demonstrate plausibly that [they were] treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity In Athletics*, 639 F.3d at 108.

Accordingly, Defendant's Motion to Dismiss Count I of the Complaint is **GRANTED**.

### B. Count Two – Claim Under Virginia Code Ann. § 15.2-2208.1

Since the Court dismisses Plaintiffs' federal law claims in Count I and Count III,[11] it lacks jurisdiction to consider Plaintiffs' state law claim in Count II. *See* 28 U.S.C. § 1367(a); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right . . . Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Even if it did have jurisdiction, the Court would nonetheless dismiss Count II because Plaintiffs have failed to identify *any* "unconstitutional condition" upon which Defendant relied in denying the 2018 Application. *See* Va. Code Ann. § 15.2-2208.1 ("[A]ny applicant aggrieved by the grant or denial by a locality of any approval or permit . . . where such grant included, or denial was based upon, an unconstitutional condition pursuant to the United States Constitution or the Constitution of Virginia, shall be entitled to [relief]"). In support of their state law claim, Plaintiffs rely solely on Count I in pleading that "Council denied the 2018 Application in violation of Owners' Equal Protection rights under the Fourteenth Amendment." Compl. at ¶ 47. Plaintiffs also allege that, "during the public hearing and immediately prior to Council's vote to deny the 2018 Application, they "objected to the impending denial, refuting all potential reasons which might be cited as the basis for such denial." *Id.* at ¶ 48. As the Court finds, however, Plaintiffs failed to sufficiently allege that Defendant took any unconstitutional action or relied on any unconstitutional basis when denying the 2018 Application.[12] Rather, Plaintiffs' allegations amount to a substantive disagreement with the bases for Defendant's decision.[13]

---

[11] *See* discussion *infra* Section III.C.
[12] *See supra* Section III.A.
[13] The Court recognizes that the parties raise other arguments with respect to this Count, but the Court need not reach those issues since it lacks supplemental jurisdiction over Plaintiffs' state law claim.

Accordingly, Defendant's Motions to Dismiss Count II is **GRANTED**.

### C. Count Three – Declaratory Judgment

Finally, Plaintiffs allege they are entitled to declaratory judgment because "[a]n actual controversy exists as Council has refused to correct the arbitrary and unconstitutional denial of the 2018 Application." Compl. at ¶ 51. Plaintiffs conclude they therefore are entitled to a judgment "declaring their constitutional and statutory rights have been violated, and declaring Council's denial of the 2018 Application is void." *Id.* at ¶ 52. As the Court has found, however, because Plaintiffs have failed to sufficiently state a claim that their constitutional or statutory rights have been violated, an actual controversy does not exist. *See* 28 U.S.C. §2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). In other words, because Count III depends on the survival of Count I and Count II, Plaintiffs are not entitled to declaratory judgment.

Accordingly, Defendant's Motion to Dismiss Count III is **GRANTED**.

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED**. Accordingly, this matter is hereby **DISMISSED**.

The Court **DIRECTS** the Clerk to provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
May 25, 2022

Raymond A. Jackson
United States District Judge